**REPUBLIC INDUSTRIES, INC.,**
**Plaintiff-Appellant,**

v.

**SCHLAGE LOCK COMPANY,**
**Defendant-Appellee.**

**No. 77–1872.**

United States Court of Appeals,
Seventh Circuit.

Argued June 5, 1978.
Decided Feb. 1, 1979.

---

William E. Lucas, John K. Lucas, Chicago, Ill., for plaintiff-appellant.

Henry L. Brinks, Chicago, Ill., for defendant-appellee.

Before SWYGERT, CUMMINGS and PELL, Circuit Judges.

SWYGERT, Circuit Judge.

Republic Industries, Inc., assignee and owner of the Slaybaugh patent, U. S. Patent No. 3,852,845, instituted this infringement action against Schlage Lock Company. Schlage counterclaimed, alleging invalidity of the patent and noninfringement. Without reaching the infringement issue, the district court in a thorough opinion held the Slaybaugh patent invalid for obviousness under 35 U.S.C. § 103 and entered judgment for defendant. *Republic Industries, Inc. v. Schlage Lock Co.*, 433 F.Supp. 666 (S.D.Ill.1977). We affirm.

This appeal presents a recurrent problem: the proper criteria by which a combination patent is measured for nonobviousness. Increasingly, the district courts in this circuit, not without some confusion emanating from this court, have taken the view that

synergism and not the criteria articulated in *Graham v. John Deere Co.,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), is the controlling test in combination patent claims.[1] Before addressing this question, we review the claims of the patent involved in this appeal.

## I

The Slaybaugh patent comprises nine claims. Claims 1 through 7 of that patent were not placed in suit by Republic; only claims 8 and 9 are alleged to be infringed. Since Republic concedes that the validity of claim 9 is dependent upon the validity of claim 8, only the latter claim will be discussed.[2]

The invention of Slaybaugh's claim 8 is a door closer used to hold open and to close fire doors in hospitals, institutional health care facilities, and other public buildings. Republic argues that the Slaybaugh device achieves a unique combination of two functions in a single unit: (1) multiple-point

hold-open, whereby a door can be held open at any point along the arc between its closed and fully opened positions; and (2) momentary manual release, whereby a door in any open position becomes self-closing when a person momentarily pushes or pulls the door.[3] The Slaybaugh patent was the first device in the history of door closers which combined these two features.

As illustrated by the schematic diagram below, claim 8 of the Slaybaugh device is essentially comprised of seven elements, each of which Republic concedes to be old and known:[4]

(1) a door-closing main spring;

(2) a piston geared to the door and sliding within an enclosed cylinder, which is activated by the main spring;

(3) hydraulic fluid[5] in the cylinder ahead of (in the diagram, to the right side of) the piston;

(4) a fluid escape passage to the right of the piston;

---

1. *See, e. g., A. F. Dormeyer Manufacturing Co. v. International Components Corp.,* (No. 76 C 2134 (N.D.Ill., June 8, 1978); *Harig Products, Inc. v. K. O. Lee Co.,* 195 U.S.P.Q. 292 (N.D.Ill. 1977); *Saunders v. Air-Flo Company,* 435 F.Supp. 298 (N.D.Ind.1977); *Republic Industries, Inc. v. Schlage Lock Co.,* 433 F.Supp. 666 (S.D.Ill.1977).

2. Claim 9 simply provides: "The combination of claim 8 wherein said means for resiliently holding said valve are electrically operated."

3. The momentary manual release feature thereby differs from manual release in that the latter is not self-closing, requiring manual force to close the door completely. Although the manual release feature is often connected to an electrical control circuit such as a smoke detector which, when activated, will close the door, the unique aspect of the momentary manual release feature, Republic argues, is that fire doors can be closed quickly and easily regardless of smoke-detector operation, e. g., when a detector might fail to operate.

4. Claim 8 claims as invention:
A combined door check and door hold open device including resilient means for urging a door toward closure upon expansion thereof, means defining a hydraulic cylinder, a piston therein connected to move toward one end of said cylinder with the expansion of said resil-

ient means, said resilient means establishing a pressure per unit area on fluid ahead of said piston means associated with said one end of said cylinder defining a passage for the escape of fluid from said one end having a valve seat therein, a valve adapted to close against said valve seat from the downstream side thereof, said valve having a face larger than said valve seat, a valve chamber downstream of said seat, a portion of said valve downstream of said face closely contained in said chamber to substantially prevent fluid flow past said valve and allow a pressure drop across said valve when said valve is open, means providing a fluid escape passage opening into said valve chamber upstream of said valve face at an open position of said valve, means providing a fluid escape passage from said valve chamber behind said closely contained portion of said valve when in said open position, and means adapted to hold said valve resiliently against said seat with a force in excess of the product of said pressure and said valve seat area and less than the product of said pressure and said face area.

5. Hydraulic fluid in a door closer is the liquid, typically oil, which flows within the door closer cylinder to provide door opening and closing speed control as well as to provide lubrication for the moving mechanical parts of the unit.

(5) a dual area valve [6] which closes the fluid escape passage;

(6) a solenoid [7] which, by exerting a force on the valve, maintains the valve in a closed position overcoming the opposing force of the door-closing spring; and

(7) a drain behind the dual area valve to insure free valve movement, since accumulation of fluid behind the valve would block or interfere with valve movement.

In its commercial embodiment, Republic's unit, called *Fire Eye II MR,* is completely encapsulated.

As the door is opened to any desired position (the multiple-point hold-open feature), a gear mechanism attached to the door causes the piston in the diagram to move to the left, thereby compressing the closing spring. The electrically controlled solenoid exerts a force on the valve to close off the fluid escape passage, thus preventing the fluid interposed between the piston and valve from escaping. Even though the closing spring is urging the piston toward the right, movement of the piston is blocked because fluid cannot escape from its chamber through the fluid escape passage when the valve is closed. The door remains open as long as the equilibrium between the opposing forces of the spring and solenoid is maintained.

An open door may be closed either automatically or manually. The door is closed automatically by deactivation of the solenoid. The solenoid is connected to an external circuit which usually includes smoke or fire detectors. When the circuit is opened, e. g., by the triggering of the smoke detector, the solenoid releases the force on the valve, thereby unseating it. Once the valve is open, the closing spring forces the piston rightward. The piston in turn forces the hydraulic fluid (interposed between the piston and the valve) past the valve through the escape passage. The gear mechanism attached to the piston swings the door toward closure.

The allegedly unique feature of the Slaybaugh patent is the momentary manual release. Unlike prior door closers which required manual assistance,[8] the Slaybaugh

6. A valve is a device in a passage that regulates fluid flow by opening or blocking the passage with a movable member. A dual area valve functions the same way, except that the valve has two faces, each a different size.

7. A solenoid is a device which uses electrical energy to create a magnetic field in a coil so that a movable core is drawn into the coil when a current flows. Here the solenoid is attached to the dual area valve.

8. In the case of manual operation, the force of the manual pull on the door, transmitted through the gear mechanism, supplements the

device requires only a brief pull or push on the door, whereby the door closes by itself. The force of the momentary pull together with the force of the closing spring are sufficient to overcome the solenoid's effect and unseat the valve, which, when open, allows the door to close by itself.

## II

■ Schlage contends that the Slaybaugh device is invalid because it is merely a combination of old elements having no synergistic effect. It takes this position regardless of whether a synergism test is defined in terms of a combination that produces an unexpected, unpredictable, or surprising result or in terms of individual elements of a combination functioning in a new and different manner. Although it is unclear whether Schlage understands synergism to be a substitute for or an addition to the statutory requirement of nonobviousness as interpreted in *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), it nonetheless argues that synergism is required by the *Anderson's-Black Rock v. Pavement Co.*, 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969), and *Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 96 S.Ct. 1532, 47 L.Ed.2d 784 (1976), decisions. A review of these cases, particularly when placed in historical context, demonstrates otherwise.

The Patent Act of 1793 required that a device had to be both new and useful to be patentable. Act of February 21, 1793, ch. XI, § 1, 1 Stat. 318. Thereafter a third criterion was judicially created: a device had to be an "invention" as well.[9] Defining "invention" proved to be elusive. Nearly a century ago, the Supreme Court said as much about the term:

> The truth is the word cannot be defined in such manner as to afford any substantial aid in determining whether a particular device involves an exercise of the inventive faculty or not. In a given case we may be able to say that there is present invention of a very high order. In another we see that there is lacking that impalpable something which distinguishes invention from simple mechanical skill. Courts, adopting fixed principles as a guide, have by a process of exclusion determined that certain variations in old devices do or do not involve invention; but whether the variation relied upon in a particular case is anything more than ordinary mechanical skill is a question which cannot be answered by applying the test of any general definition.

*McClain v. Ortmayer*, 141 U.S. 419, 427, 12 S.Ct. 76, 78, 35 L.Ed. 800 (1891). The imprecision of the "invention" standard resulted in an inconsistent and unpredictable body of law because it required that the decision of patentability be based ultimately upon the subjective whims of the reviewing court.[10]

Congress revised the patent laws in 1952.[11] The novelty and utility requirements were maintained and recodified. 35 U.S.C. §§ 101, 102. The retention of these requirements did not, however, completely define the concept of patentability; missing

---

preexisting force of the closing spring. The combined resultant force moves the piston rightward. This piston movement generates sufficiently high pressure in the fluid chamber to the right of the piston to overcome the force of the solenoid and unseat the valve.

**9.** It is generally recognized that *Hotchkiss v. Greenwood*, 52 U.S. (11 How.) 248, 13 L.Ed. 683 (1851) is the earliest statement of the requirement of "invention."

**10.** In this regard, Judge Rich, one of the coauthors of section 103, stated:

In the final analysis, all it amounted to was that if the court thought the invention, though new and useful, was not patentable, then it did not involve "invention" and vice versa. The requirement for "invention" was the plaything of the judges who as they became initiated into its mysteries, delighted to devise and expound their own ideas of what it meant; some very lovely prose resulting. *Principles of Patentability*, 28 Geo.Wash.L.Rev. 393, 404 (1960).

**11.** Patent Act of 1952, ch. 950, 66 Stat. 798, *codified in* 35 U.S.C. §§ 101 *et seq.*

was that essential quality which goes beyond mere newness or usefulness—the "something" that the courts had unsuccessfully strived for by the use of the term "invention." In order to start afresh in a semantic sense and to promote uniformity in the application of the patent laws, Congress added section 103.[12] That provision replaced the judicially imposed requirement of "invention" with that of "nonobviousness": [13]

> A patent may not be obtained . . if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

35 U.S.C. § 103.

Section 103 received its definitive interpretation in *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). There, the Court, in calling for "strict observance" of its requirements, laid out the analysis to be followed in cases involving the obviousness standard:

> While the ultimate question of patent validity is one of law [citation omitted], the § 103 condition, which is but one of three conditions, each of which must be

satisfied, lends itself to several basic factual inquiries. Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved.

*Id.* at 17, 86 S.Ct. at 694. It is against this backdrop that *Black Rock* and *Sakraida* must be read.

*Black Rock* involved a combination patent in which each of the elements were known in the prior art.[14] In that case the Court recited that it would adhere to the guidelines it had developed in *Graham*. 396 U.S. at 61–63, 90 S.Ct. 305. Using such analysis, the Court held the patent at issue invalid because "the combination was reasonably obvious to one with ordinary skill in the art." *Id.* at 60, 90 S.Ct. at 307. Although during the course of its discussion the Court noted that a combination "may result" in a synergistic effect,[15] the Court went on to hold that the device in question "was not an invention by the obvious-nonobvious standard," *id.* at 63, 90 S.Ct. at 309; this phrase could only refer to *Graham* and section 103.

Similarly in *Sakraida*, the Court scrutinized the combination patent in issue by considering the scope and content of the prior art together with the differences between that art and the claimed invention.[16]

---

**12.** The Reviser's note to section 103 provides:
There is no provision corresponding to the first sentence explicitly stated in the present statutes, but the refusal of patents by the Patent Office, and the holding of patents invalid by the courts, on the ground of lack of invention or lack of patentable novelty has been followed since at least as early as 1850. This paragraph is added with the view that an explicit statement in the statute may have some stabilizing effect, and also to serve as a basis for the addition at a later time of some criteria which may be worked out.
*See also* H.R. Rep. No. 1923, 82d Cong., 2d Sess. 7 (1952), quoted in *Graham, supra* 383 U.S. at 15, 86 S.Ct. 684.

**13.** Under the 1952 Act, the word "invention" was statutorily defined as any "invention or discovery." 35 U.S.C. § 100(a). Thus, an invention which is novel, useful and nonobvious is a patentable invention; a device which is

lacking one or more of the criteria is an unpatentable invention.

**14.** The claimed invention in *Black Rock* was the placement of a radiant-heat burner, a bituminous paving machine, and an asphalt shaper apparatus on one chassis. All three elements were old in the paving art. The alleged contribution was the combining of these three elements into a single paving machine.

**15.** The extent of the Court's discussion of synergism was limited to two sentences: "A combination of elements may result in an effect greater than the sum of the several effects taken together. No such synergistic result is argued here." 396 U.S. at 61, 90 S.Ct. at 308.

**16.** The patent in *Sakraida*, a device designed to remove animal wastes from a dairy barn, involved the combination of a graded floor, flush troughs, and a means for storing water for a flood-effect release onto the barn floor.

In holding the patent invalid, the Court held: "[T]his particular use of the assembly of old elements would be obvious to any person skilled in the art of mechanical application." 425 U.S. at 282, 96 S.Ct. at 1537. Although the Court again discussed synergism, it is apparent from the context of the opinion that the Supreme Court raised the topic only in response to the court of appeals' assertion that synergism was present; the Court simply did not agree that the effect produced by the claimed invention in that case was synergistic.[17]

Neither *Sakraida* nor *Black Rock* can be cited as prescribing some other, special test for the evaluation of combination claims. Nowhere in these two decisions did the Court hold a synergistic effect to be a necessary condition of patentability; nor did it hold that to synergism supersedes a finding of nonobviousness under the *Graham* analysis. To the contrary, each case quoted *Graham* with approval. Each turned on whether the claimed invention was nonobvious on the basis of the three-pronged test in *Graham*. In short, we believe that *Sakraida* and *Black Rock*, rather than establishing an additional, different, or substituted test for nonobviousness under section 103, reaffirmed the continuing vitality of *Graham*.[18]

■ The district court, while agreeing that *Black Rock* and *Sakraida* did not establish synergism as a requisite for patentability, nonetheless interpreted cases from this court as requiring that every combination invention must have a synergistic effect to be patentable.

The synergism test necessarily involves a two-pronged hypothesis: (1) the subject matter of the patent claim comprises a combination of several elements, each of which was known in the prior pertinent art, and (2) the combination is synergistic or at least produces a synergistic "effect." One premise of this hypothesis, at least as applied to mechanical or hydraulic devices, is that all such inventions are merely new applications of known elements and materials in different combinations. As Judge Learned Hand observed:

> It is idle to say that combinations of old elements cannot be inventions; substantially every invention is for such a "conbination": that is to say, it consists of former elements in a new assemblage.

*Reiner v. I. Leon Co.*, 285 F.2d 501, 503 (2d Cir. 1960), *cert. denied*, 366 U.S. 929, 81 S.Ct. 1649, 6 L.Ed.2d 388 (1961).[19] If this be true (and if new nonobvious combinations are not patentable), then almost nothing would be patentable. *See Reeves Instrument Corp. v. Beckman Instruments, Inc.*, 444 F.2d 263, 270 (9th Cir.), *cert. denied*, 404 U.S. 951, 92 S.Ct. 283, 30 L.Ed.2d 268 (1971).

Once it has been determined that all of the elements in the combination are known, the next inquiry under the synergism approach is whether the claimed patent is synergistic or produces a synergistic effect. This has been no easy task. Courts have long wrestled with the meaning of synergism and have formulated a number of definitions. The two most common have

---

**17.** The Fifth Circuit in *Sakraida* had held that the invention in issue "[did] achieve a synergistic result." 474 F.2d 167, 173 (5th Cir. 1973). To this conclusion the Supreme Court responded: "We cannot agree that the combination of these old elements . . . can properly be characterized as synergistic . . .." 425 U.S. at 282, 96 S.Ct. at 1537. It is thus apparent that the reference to synergism arises not as a statement of an affirmative requirement of patentability, but rather as a rejection of the Fifth Circuit's holding.

**18.** We believe our view is supported by the Court's action in *Dann v. Johnston*, 425 U.S. 219, 96 S.Ct. 1393, 47 L.Ed.2d 692 (1976), decided just three weeks before *Sakraida*. In *Dann*, the briefs of the petitioner and one of the

*amici* argued that synergism is essential for patentability and that the patent in issue was not synergistic. *See* Brief of Petitioner at 29; Brief of *Amici Curiae* for the Computer & Business Equipment Manufacturers Ass'n at 9. Importantly, the Court did not discuss, nor did it even mention, synergism. Instead, the claimed patent in that case was evaluated exclusively under the *Graham* pattern of analysis. 425 U.S. at 226–30, 96 S.Ct. 1393.

**19.** *See also Safety Car Heating & Lighting Co. v. General Electric Co.*, 155 F.2d 937, 939 (2d Cir. 1946); *Ruben Condensor Co. v. Copeland Refrigeration Corp.*, 85 F.2d 537, 541 (2d Cir. 1936), *cert. denied*, 300 U.S. 665, 57 S.Ct. 508, 81 L.Ed. 873 (1937).

been that one of the elements functions differently in combination than it did previously, *e. g., Burland v. Trippe Manufacturing Co.*, 543 F.2d 588, 592 (7th Cir. 1976), and that the combination results in an effect greater than the sum of the several parts taken separately. *E. g., St. Regis Paper Co. v. Bemis Co.*, 549 F.2d 833, 838 (7th Cir.), *cert. denied*, 434 U.S. 833, 98 S.Ct. 119, 54 L.Ed.2d 94 (1977).[20] A realistic appraisal of these formulations, however, reveals that synergism is only a figure of speech, for in its literal sense synergism never has existed and never can exist in mechanical or hydraulic inventions when the term is defined as a whole result greater than the sum of its constituent parts.[21]

There is, in fact, no such thing as a mechanical or hydraulic element functioning differently in combination than it did outside the combination. A spring or valve will always function as a spring or valve, alone or in concert with other components.[22] Moreover, mechanical elements can do no more than contribute to the combination the mechanical functions of which they are inherently capable. *See Application of Menough*, 323 F.2d 1011, 1015, 51 C.C.P.A. 741 (1963). Thus, the overall performance of the combination is always equal to the sum of the functions of its individual components. As Judge William Conner of the Southern District of New York observed: "In the real world, two plus two never equals five." *Some Highly Personal Reflections on Section 103*, 5 Am.Pat.L.Q. 77, 85 (1977). *Compare Great A & P Tea Co. v. Supermarket Equipment Co.*, 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162 (1950) ("Two and two have been added together and they still make only four.").

A definition of synergism that reflects its etymon is that the elements in the combination must cooperate or interact with each other.[23] So defined, synergism distinguishes those inventions in which the parts are merely aggregated,[24] and those in which the parts coact with each other so that the result comes from the combined effect of the several parts and not simply from the separate action of each. Under this formulation, the presence or absence of synergism proves little. Today, almost all mechanical devices consist of parts which interact with each other. This interaction has little, if anything, to do with the required nonobviousness of the claimed invention. Although the absence of interaction

**20.** Other definitions have included: the elements must take on a surprising quality, *Gettleman Manufacturing, Inc. v. Lawn 'N' Sport*, 517 F.2d 1194, 1199 (7th Cir. 1975); the combination must produce a result other than the anticipated sum of the separate parts, *E-T Industries, Inc. v. Whittaker Corp.*, 523 F.2d 636, 641 (7th Cir. 1975), *cert. denied*, 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150 (1976); the elements must, in the aggregate, produce new, unusual or striking results, *Panduit Corp. v. Burndy Corp.*, 517 F.2d 535, 539 (7th Cir.), *cert. denied*, 423 U.S. 987, 96 S.Ct. 395, 46 L.Ed.2d 304 (1975); the results must be unachieved by prior art structures, *Reese v. Elkhart Welding & Boiler Works, Inc.*, 447 F.2d 517, 526 (7th Cir. 1971).

**21.** At least in one basic sense, no result is actually greater than the sum of its parts. To the extent that some combination of elements appears synergistic, it is a function of our imperfect knowledge of the properties of the parts. If one could truly get more out of a combination than was put into it, it would amount to a creation of something out of nothing and would contravene the basic laws of nature as we understand them. If these laws

remain valid, the appearance of synergism merely indicates prior ignorance instead of creation. Ignorance or lack of knowledge is, however, but part of the question of obviousness. Thus, at best, the appearance of synergism is subsumed within the question of nonobviousness under section 103 and the *Graham* criteria.

**22.** Assuming *arguendo* that there exists an exception, the new function should nevertheless not be a *sine qua non* to a finding of patentability, but merely be taken as evidence to be considered along with other evidence available in the obvious-nonobvious inquiry.

**23.** The term synergism derives from the Greek, *syn*, together, and *ergos*, work, to work together, cooperate. The Oxford English Dictionary (Clarendon Press 1919). *See* Rich, *Laying the Ghost of the "Invention" Requirement*, 1 Am. Pat.L.Q. 26, 43–44 (1972).

**24.** The classic example of aggregation is unitary lead pencil and rubber eraser. *See Reckendorfer v. Faber*, 92 U.S. 347, 23 L.Ed. 719 (1876).

may demonstrate the obviousness of the combination, the presence of interaction assuredly does not impart nonobviousness to a device clearly suggested by the prior art. As thus defined, synergism is simply too broad to provide a useful yardstick with which to measure patentability.

Putting the definitional aspects aside, there are more fundamental flaws in the use of synergism as a standard for patentability. In enacting section 103, Congress expressly mandated nonobviousness, not synergism, as the sole test for the patentability of novel and useful inventions: indeed, synergism is not even mentioned in the Patent Act of 1952. Moreover, as section 103 applies to all patent claims, there is no justification why patentability of a combination patent should be measured by a different standard than any other type of invention.

More importantly, when using the synergism approach to determine whether one element functions differently or whether the whole somehow exceeds the parts, one is required to look solely to the operation of the elements *after* they are combined. This analysis suffers from two defects. First, a test which looks exclusively to the functioning of the individual components after they are combined must necessarily be premised on the assumption that it is always obvious to take known elements and combine them. We find this assumption unsound and not based in fact. It may be that in certain circumstances the very choice of the elements to be selected is not obvious. Again, as Judge Hand noted:

All machines are made up of the same elements; rods, pawls, pitmans, journals, toggles, gears, cams, and the like, all acting their parts as they always do and always must. All compositions are made of the same substances, retaining their fixed chemical properties. But the elements are capable of an infinity of permutations and the selection of that group which proves serviceable to a given need may require a high degree of originality. *It is that act of selection which is the invention . . . .*

*B.G. Corp. v. Walter Kidde & Co.*, 79 F.2d 20, 22 (2d Cir. 1935) (emphasis added). *See also Application of Menough*, 323 F.2d 1011, 1015, 51 C.C.P.A. 741 (1963).

The second and more basic defect with synergism is that section 103 sets as the standard of patentability the nonobviousness of the invention "at the time the invention was made to a person having ordinary skill in the art . . . ." This provision therefore compels the courts to view the invention from the vantage point of the field of art at a specific point in time, *i. e.*, the time the invention was made. *See* Rich, *Principles of Patentability*, 28 Geo. Wash.L.Rev. 393, 405–06 (1960). From this vantage point the critical question becomes whether the level of skill in the art was such that the combining of the elements in the manner claimed would have been obvious, not in retrospect, but at the time it was done by the inventor. As the Supreme Court stated in *United States v. Adams*, 383 U.S. 39, 50, 86 S.Ct. 708, 713, 15 L.Ed.2d 572 (1966), a companion case to *Graham* :

It begs the question . . . to state merely that magnesium and cuprous chloride were individually known battery components. If such a combination is novel, the issue is whether bringing them together as taught by [the inventor] was obvious in the light of the prior art.

Synergism, however, precludes this analysis. Because synergism centers exclusively on the performance of the elements *after* combination and without regard to the obviousness or nonobviousness of *making the combination*, synergism does not comport with the *Graham* mandate to apply section 103.

Regrettably, we have heretofore failed to provide clear and consistent guidance regarding the standards appropriate for combination patents. Although we have in fact continued, either explicitly or implicitly, to judge patent validity according to the *Graham* analysis, we have also from time to time commented on the presence or absence of a requirement akin to synergism in the claimed invention under review. And in *St. Regis*, we stated our conclusion in such a way that it may seem that we regard syner-

gism as a test separate from and coequal to that for nonobviousness under section 103. Inasmuch as *Graham* and section 103 continued to be the guiding light, the results of those cases were not in error. But as the foregoing discussion makes evident, this court never intended that synergism be applied literally or that synergism is the *sine qua non* of patentability. Rather, the concept was employed only as a figure of speech to express the truism that when all the parts of a claimed invention are known, the combination (and the act of combining) is likely to be more obvious to one reasonably skilled in the art.[25] *See Reeves Instrument Corp. v. Beckman Instruments, Inc.,* 444 F.2d 263, 271 (9th Cir.) *cert. denied,* 404 U.S. 951, 92 S.Ct. 283, 30 L.Ed.2d 268 (1971). However, because synergism has prevented the development of a consistent, predictable body of law under section 103, and because the concept does not bear any logical *ipso facto* relationship to obviousness, the term has little, if any, utility. Therefore until Congress shall otherwise legislate or the Supreme Court shall otherwise specifically hold, this court will continue to apply the *Graham* analysis as the exclusive means by which to measure nonobviousness under section 103.

Perhaps a *caveat* is in order: by our holding today we have no intention of departing from the high standard of patentability which is reflected in the *Black Rock* and *Sakraida* decisions. Though rendered nearly a century ago, the Supreme Court's discussion in *Atlantic Works v. Brady,* 107 U.S. 192, 200, 2 S.Ct. 225, 231, 27 L.Ed. 438 (1883), of the purpose behind the patent laws remains true today:

> The design of the patent laws is to reward those who make some substantial discovery or invention, which adds to our knowledge and makes a step in advance in the useful arts. Such inventors are worthy of all favor. It was never the object of those laws to grant a monopoly

for every trifling device, every shadow of a shade of an idea, which would naturally and spontaneously occur to any skilled mechanic or operator in the ordinary progress of manufactures. Such an indiscriminate creation of exclusive privileges tends rather to obstruct than to stimulate invention. It creates a class of speculative schemers who make it their business to watch the advancing wave of improvement, and gather its foam in the form of patented monopolies, which enable them to lay a heavy tax upon the industry of the country, without contributing anything to the real advancement of the arts. It embarrasses the honest pursuit of business with fears and apprehensions of concealed liens and unknown liabilities of lawsuits and vexatious accountings for profits made in good faith.

### III

Having thus disposed of the synergism issue, we are left with the question of the instant patent's validity. We begin this analysis by noting that a patent is presumed valid. 35 U.S.C. § 282. That presumption, however, is not conclusive, *St. Regis Paper Co. v. Bemis Co.,* 549 F.2d 833, 838 (7th Cir.), *cert. denied,* 434 U.S. 833, 98 S.Ct. 119, 54 L.Ed.2d 94 (1977); it merely shifts the burden of proof to the party attacking the validity of the patent. *Maxon Premix Burner Co. Eclipse Fuel Engineering Co.,* 471 F.2d 308, 312 (7th Cir. 1972), *cert. denied,* 410 U.S. 929, 93 S.Ct. 1365, 35 L.Ed.2d 591 (1973). Furthermore, that presumption does not exist against evidence of prior art not before the Patent Office. *The Allen Group v. Nu-Star, Inc.,* 575 F.2d 146 (7th Cir. 1978) (per curiam); *Ropat Corp. v. McGraw Edison Co.,* 535 F.2d 378, 383 (7th Cir. 1976). "Even one prior art reference not considered by the Patent Office can suffice to overthrow the presumption." *Henry Manufacturing Co. v. Commercial Filters Corp.,* 489 F.2d 1008,

---

**25.** The Supreme Court has expressed this idea in similar terms: "Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding [a patentable] invention in an assembly of old elements. . . ." *Great A & P Tea Co. v. Supermarket Corp.,* 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162 (1950). *Accord, Sakraida v. Ag Pro, Inc.,* 425 U.S. 273, 281, 96 S.Ct. 1532, 47 L.Ed.2d 784 (1976).

1013 (7th Cir. 1972). Observing these considerations, we now evaluate the Slaybaugh patent to determine whether it is obvious under the *Graham* criteria.

■ The parties agree, and the district court found, that the Martin patent, U.S. Patent No. 3,696,462, is pertinent prior art relating to the Slaybaugh invention. The Martin patent, also owned by Republic, describes a hydraulic door closer with multiple-point hold-open but without momentary manual release. The innovative feature of the Martin device was the introduction of an electrically controlled valve in the escape passage of the hydraulic fluid which, when energized by a solenoid, blocked passage of the fluid, thereby preventing further movement of the piston in the closing direction.[26] Use of the solenoid-operated hold-open valve in this manner had two distinct effects: (1) an open door would close automatically at a controlled rate when the solenoid valve circuit was interrupted, *e. g.,* by triggering of a smoke detector,[27] and (2) the continuing force of the solenoid on the valve made it possible for the door to have a multiple-point hold-open feature. Because of the addition of the valve-solenoid structure, the Martin patent was the first device in the door closer art which had a multiple-point hold-open feature and which could be closed automatically.[28]

The Slaybaugh patent is similar in construction and operation to the Martin device in many respects. Like Martin, Slaybaugh employs a spring and a piston with a cylinder filled with hydraulic fluid. Like Martin, Slaybaugh also uses an electronically operated solenoid hold-open valve apparatus. As a result, it to has the multiple-point hold-open and automatic closing features.

The distinctive and, in Republic's view, the innovative feature of the Slaybaugh device is the addition of momentary manual release to the door closer art.

Republic argues that Slaybaugh's contribution to the art—momentary manual release—was achieved by adding components to the Martin patent and by proportioning key elements. The crux of Slaybaugh's improvement over Martin and the principal difference which allows momentary manual release is the employment of a dual area valve. As illustrated in the diagram below, a dual area valve is constructed with a face area (B) which is larger than the area of its seat when the valve is closed (A):[29]

Once the valve is opened by the combined force of the closing spring and the momentary push, the fluid pressure acts on a larger face area than it did when the valve was closed. Since force is the product of pressure times area, the high pressure fluid acting on the entire projected valve face area, exposed when the valve is open, develops a force sufficient to overpower the opposing force exerted on the valve by the solenoid. Because the solenoid is overpowered, the valve stays open until the fluid

**26.** Martin was not the first patent to use a solenoid-operated control valve. Earlier patents, however, used the solenoid to assist fluid pressure in seating the valve rather than to oppose the pressure. *See e. g.,* Rice, U.S. Patent No. 2,394,105; Koch, U.S. Patent No. 1,883,957.

**27.** The Martin patent was directed toward satisfying the industry's need for a door hold-open device which could close automatically if fire or smoke were detected.

**28.** As with prior door closers, the Martin device could also be closed manually, but the door had to be pushed or pulled continuously all the way toward closure.

**29.** This diagram is, of course, but a two-dimensional representation of the conical structure in the Slaybaugh device.

escapes and the door closes by itself, without additional manual assistance.[30]

The Martin patent, however, is not the only pertinent prior art. Other patents, which Republic failed to disclose to the Patent Office, teach the concept of dual area valves.[31] Because Republic did not disclose these, the presumption of validity does not obtain for the Slaybaugh patent against this evidence of prior art. *The Allen Group, Inc. v. Nu-Star, Inc., supra; Ropat Corp. v. McGraw-Edison Co., supra.*[32]

The use and effect of dual area valves in hydraulic systems was described at least as early as 1945 in a publication entitled *Basic Hydraulics.* That article explained the principles of operation involved in a hydraulic pressure relief valve where the area of the valve seat is smaller than the area of the valve face and discussed the effect of this differential area on the valve operation. *See* note 30 *supra.* It showed that by intentionally proportioning the force of the main spring, the valve seat area, the valve face area, and the amount of force holding

the valve closed, one can, by momentarily adding pressure, open a closed valve, then remove that added pressure and yet have the valve remain open.

A number of patents[33] have employed the concepts articulated in *Basic Hydraulics* and have used them to advantage in fluid control relief valves. Although the valves described in these patents vary in their structure and precise mode of operation, each of them teaches use of the differential area concept to keep a valve open at a reduced pressure once it has been opened at a higher pressure. The valves in these patents are constructed in a similar fashion, perform similar functions, and achieve results similar to those achieved by the valve construction defined in claim 8 of the Slaybaugh invention.[34]

Republic argues, however, that these patents are not in the pertinent prior art because they are related to the valve and fluid handling art rather than the door control art.[35] Such a restricted view of the applica-

30. The principle of dual area valves is illustrated by the following example: If the area of the valve seat (A) is 0.5 square inch and a force (exerted by solenoid, for example) of 250 pounds is sufficient to keep the valve closed, the valve will crack open when the hydraulic pressure exceeds 500 pounds per square inch (PSI) since 500 PSI times 0.5 square inch equal 250 pounds of force. Once the valve has cracked open, however, the 500 PSI fluid is exposed to the larger area of the valve face (B); 1.0 square inch, for example. 500 PSI times 1.00 square inch equal 500 pounds of force then holding the valve open—an amount far in excess of the 250 pound force attempting to close the valve. Accordingly, fluid flows out of the valve seat, past the valve, until the hydraulic pressure drops from 500 PSI to 250 PSI. Until that time the valve remains open, allowing the fluid to escape and thereby closing the door.

31. *See, e. g.,* Prijatel, et al., U.S. Patent No. 2,980,132; Parker, U.S. Patent No. 2,431,760; Hubbard, U.S. Patent No. 3,117,321.

32. Republic argues that Martin, in using a ball valve, also had a dual area valve construction. As a result, Republic contends that the Martin patent is more pertinent prior art than Prijatel, et al., because Martin is in the door holder-closer art. In effect, Republic argues that Martin contains the same dual area valve construction and function that Prijatel, et al. did.

The fact is that most valves do have larger valve face areas than valve seat areas. But such valves, including the ball valve employed by Martin, do not *intentionally* proportion the valve seat area, the valve face area, and the valve biasing force. The Martin patent simply does not teach such a valve intentionally proportioned to open at a predetermined high pressure and then stay open to permit fluid escape until the pressure effect on the valve face drops to a predetermined lower pressure.

33. *See* note 31 *supra.*

34. Republic argues that the prior art dual area valves are "dump" valves, while the valve used in the Slaybaugh device is not. Although certain prior art valves were used as dump valves, *see, e. g.,* Hubbard, others were not designed merely to dump all the fluid out of a chamber but rather to keep fluid flowing out of a chamber until the pressure in the chamber dropped below a predetermined level. *See, e. g.,* Prijatel, et al.; Parker.

35. During the prosecution of the patent, the Patent Office cited several patents for their valve disclosures. *See* patents cited in note 26 *supra.* None of these patents are in the door closer art. Interestingly, Slaybaugh did not argue that these patents were nonanalogous. Rather Slaybaugh argued that the valves were not the same because they did not oppose fluid

ble art is not justified. *Cf. Graham v. John Deere Co.,* 383 U.S. 1, 35, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); *see also Dann v. Johnston,* 425 U.S. 219, 228–29, 96 S.Ct. 1393, 47 L.Ed.2d 692 (1976). The prior art that is relevant in evaluating a claim of obviousness is defined by the nature of the problem confronting the would-be inventor. The problem confronting Slaybaugh in developing momentary manual release was to devise a way the door control valve would stay open after it had been manually forced open. Once the problem was recognized, the place to find the solution became apparent. At that point, the art most pertinent to Slaybaugh or any other practitioner in the door closer art was the valve and fluid handling art, not the door control art. Accordingly, the valve art is pertinent to the claimed invention.

■ Having determined that the differences between Slaybaugh and the pertinent prior art are small does not end our inquiry. "[T]he obviousness test of § 103 is not one which turns on whether an invention is equivalent to some element in the prior art but rather whether the difference between the prior art and subject matter in question is a difference sufficient to render the claimed subject matter unobvious to one skilled in the applicable art." *Dann v. Johnston,* 425 U.S. 219, 228, 96 S.Ct. 1393, 47 L.Ed.2d 692 (1976) (internal quotes omitted). In making that determination, obviousness is measured by what would be obvious to one reasonably skilled in the applicable art, not by what would be obvious to a layman. *Id.* at 229, 96 S.Ct. 1393. *See also Graham, supra,* 383 U.S. at 37, 86 S.Ct. 684. And obviousness is measured not by considering what was obvious to actual artisans but by considering whether a hypothetical person, having all of the prior art at hand, would have found the same solution when addressing himself to the same problem. *Popeil Brothers, Inc. v. Schick*

*Electric, Inc.,* 494 F.2d 162, 167 (7th Cir. 1974); *see Systematic Tool & Machine Co. v. Walter Kidde & Co., Inc.,* 555 F.2d 342, 348 n.8 (3d Cir.), *cert. denied,* 434 U.S. 857, 98 S.Ct. 178, 54 L.Ed.2d 128 (1977); *Malsbary Manufacturing Co. v. Ald, Inc.,* 447 F.2d 809, 813 (7th Cir. 1971), (Stevens, J., dissenting). The district court found, and we agree, that such a hypothetical person in the door closer art would have knowledge of basic hydraulics. This knowledge would have included safety and pressure relief valves which teach use of the dual area concept to keep a valve open after the initial pressure is reduced.[36]

Even with this awareness, Republic argues that Slaybaugh advanced the art because of his proportioning of the force of the main spring, the valve seat area, the projected valve face area, and the counterforce of the solenoid. This, however, amounted to little more than the mathematical task of filling in the variables of a given equation. We find this proportioning simply to be "the work of a skillful mechanic, not that of the inventor." *Hotchkiss v. Greenwood,* 52 U.S. (11 How.) 248, 267, 13 L.Ed. 683 (1851).

■ Republic strenuously argues that we should weigh such secondary considerations as commercial success, long felt need, and failure of others. *See Graham, supra,* 383 U.S. at 17–18, 86 S.Ct. 684. Even assuming the presence of these factors in this case— of which we have some doubt—we decline this invitation. While such secondary considerations may be "indicia of obviousness or nonobviousness," *id.* at 18, 86 S.Ct. 684, "those matters 'without invention will not make patentability.'" *Anderson's-Black Rock, Inc. v. Pavement Salvage Co.,* 396 U.S. 57, 61, 90 S.Ct. 305, 308, 24 L.Ed.2d 258 (1969). Only in a close case, in which application of the primary criteria of nonobviousness under section 103 does not produce

---

pressure from downstream of the valve seat and did not have area relationships wherein they would open at a predetermined high pressure and, subsequently, remain open when that pressure dropped to a predetermined lower pressure.

**36.** Slaybaugh himself admitted in a deposition that he was familiar with relief valves of the type disclosed by Prijatel, et al. Defendant's Trial Exhibit No. 38 at 153.

a firm conclusion, can these secondary considerations be used to "tip the scales in favor of patentability." *Panduit Corp. v. Burndy Corp.,* 517 F.2d 535, 541 (7th Cir.), *cert. denied,* 423 U.S. 987, 96 S.Ct. 395, 46 L.Ed.2d 304 (1975). Because we hold that the claims made here are clearly obvious under section 103, we deem it unnecessary to examine these secondary considerations.

The judgment of the district court is affirmed.