**Andrew EISELE, dba Zero Internal Gauge Company, Plaintiff-Appellant,**

v.

**John P. ST. AMOUR, Defendant-Appellee.**

**No. 19398.**

United States Court of Appeals, Sixth Circuit.

March 25, 1970.

Willis Bugbee, Detroit, Mich., for appellant.

Martin J. Adelman, Birmingham, Mich., Barnard, McGlynn & Reising, Gerald E. McGlynn, Jr., Birmingham, Mich., on the brief, for appellee.

Before WEICK and EDWARDS, Circuit Judges, and O'SULLIVAN, Senior Circuit Judge.

EDWARDS, Circuit Judge.

This is an appeal from a judgment entered after trial before the United States District Court for the Eastern District of Michigan dismissing appellant Eisele's complaint. The complaint sought a declaratory judgment that St. Amour's patent No. 2,998,656 was invalid and not infringed by Eisele's devices.

Most of this lengthy record on trial and on appeal pertains to the issue of infringement. Since we conclude that St. Amour's device was novel, useful, but fatally obvious, and, hence, unpatentable, we do not reach the infringement issue.

St. Amour's patent No. 2,998,656 claimed an improved "hole location and concentricity gauge." These gauges are used in the automobile industry in connection with a master fixture to test the

location and the concentric accuracy of various holes drilled in automobile parts.

Both parties are inventors who had been supplying such gauges primarily to the Ford Motor Company. Plaintiff Eisele appears to have been in the gauge business first. He secured a number of patents on such concentricity gauges and had a commercially successful one in existence. This Eisele gauge, however, had an indicator dial for the inspector to read which turned 360° while the gauge was being turned in the hole which was to be inspected. As St. Amour's counsel stated, it meant "the workmen had to stand on his head." St. Amour's "invention" was to devise a very similar gauge where the body of the gauge and the indicator dial remained stationary while the operator turned the probe (the part which measured concentricity of the hole) by a knob contained in the body of the gauge which he could turn with his fingers.

St. Amour developed the improved gauge, put it on the market, and applied for a patent. Before St. Amour's patent was actually issued, however, Eisele had found out about the improvement, made a very similar change, applied for a patent and received it. There is no dispute that plaintiff St. Amour's patent has priority as to time of invention and use.

St. Amour's patent described the operation of his gauge as follows:

"The part to be checked will be clamped in the master or reference gauge. Then, the pilot body 20 would be inserted in a closely fitted hole in the master gauge. The sleeve 48 would then be rotated by means of rotating knob 52, with the thumb and forefinger. The feeler 78 may then contact the wall of a bore or hole being checked, and because of the cam surface 86 and the ball 90, the feeler 78 will cause the pointer 110 to register any out of roundness of the hole as well as the position of the hole being checked in relation to the master gauge hole. Thus, since the location and also the diameter of the hole being checked will be registered by the pointer 110,

an operator using this device may interpret this reading so as to determine the correct location and concentricity of a hole."

The improvement on which the patent was claimed and granted is explained somewhat more understandably as follows:

"A knurled knob is provided within the chamber in the body and is fixed to the sleeve, so that rotation of the knob will also rotate the sleeve, and the feeler, so that 360° of concentricity may be determined. While the sleeve, feeler and knob are rotatable, the rest of the gauge is not, and the indicator remains stationary, so that it is always facing the operator even while the sleeve is being rotated."

St. Amour's gauge was certainly the first hole location and concentricity gauge to have a stationary dial. It was "novel" at least in this respect. This record (which shows its commercial success) demonstrated its "utility."

To any layman a "hole location and concentricity gauge" is an intricate and sophisticated piece of equipment. It is not by any means a device which would be termed "obvious" in the ordinary understanding of that term.

The Constitution of the United States authorizes Congress "To promote the Progress of * * * useful Arts, by securing for limited Times to * * * Inventors the exclusive Right to their * * * Discoveries." U.S.Const. art. I, § 8, cl. 8. In seeking to define these terms, Congress set forth in the 1952 Patent Act the requirements of novelty and utility (35 U.S.C. §§ 101, 102 (1964)), and then defined the third critical element as follows:

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a per-

son having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made." 35 U.S.C. § 103 (1964).

■ Thus, the term "obvious" has a distinctly special meaning in the patent law. There it is obviousness "to a person having ordinary skill in the art," which is of importance.

In Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), the United States Supreme Court discussed the tests of obviousness under § 103:

"While the ultimate question of patent validity is one of law, Great Atlantic & Pacific Tea Co. v. Supermarket Corp., supra at 155 [340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950)] the § 103 condition, which is but one of three conditions, each of which must be satisfied, lends itself to several basic factual inquiries. Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy." Graham v. John Deere Co., *supra* at 17–18, 86 S.Ct. at 694.

The question before the District Court, and now before us, is whether or not the *improvement* in the hole location and concentricity gauge which resulted in the indicator dial remaining stationary was obvious within the meaning of patent law. As Justice Clark observed in the *Graham* case, "He who seeks to build a better mousetrap today has a long path to tread before reaching the Patent Of-

fice." Graham v. John Deere Co., *supra* at 19, 86 S.Ct. 684.

The District Judge made the following findings and conclusions on the obviousness issue:

"St. Amour disclosed and claimed a hole location having a stationary indicator whereas the prior art taught rotating-indicator rotating-probe hole location and concentricity gauges, and a stationary indicator gauge for measuring the out-of-roundness of an aircraft cylinders [sic] and operating on a different principle than the gauge of St. Amour. These prior art devices were in existence for many years and yet while the art of hole location and concentricity gauges was one in which there was considerable patent activity, it was not until an outsider, St. Amour, entered the field that a stationary indicator hole location and concentricity gauge was forthcoming. Thus, the St. Amour invention was not obvious to one skilled in the gauge art at the time the invention was made.

\* \* \* \* \* \*

"The invention disclosed and claimed in the St. Amour patent would not have been obvious to a man of ordinary skill in the gauge art at the time of the invention."

It should be noted that the patent in suit makes no claims either as to the hole location or concentricity gauge itself, or as to the indicator and the mechanism which connects it with the concentricity probe. In short, this is a claim of invention resulting solely from the combination of two parts well known in the art in such a fashion that one could be rotated while the other remained stationary.

The relative simplicity of this change, the ease with which St. Amour accomplished it when requested to do so, and the promptness with which Eisele followed when St. Amour's stationary indicator gauge proved successful all strongly suggest obviousness to one skilled in the art. As the courts have repeatedly noted, an ordinary mechanical

improvement does not entitle the originator of it to a patent, no matter how useful or commercially successful it may prove to be.

In Hotchkiss v. Greenwood, 52 U.S. (11 How.) 248, 13 L.Ed. 683 (1851), the Supreme Court stated:

> "[U]nless more ingenuity and skill * * * were required * * * than were possessed by an ordinary mechanic acquainted with the business, there was an absence of that degree of skill and ingenuity which constitute essential elements of every invention. In other words, the improvement is the work of the skillful mechanic, not that of the inventor." Hotchkiss v. Greenwood, *supra* at 267.

*See also* Ludwig Drum Co. v. Solar Musical Instrument Co., 376 F.2d 827 (6th Cir. 1967).

This record also discloses a patent which must be held to be a part of the prior art, despite the fact that it had not been called to the attention of the Patent Office. The Heitzmann patent No. 838,-409 (a French patent) described a concentricity gauge with a rotatable probe and a stationary indicator.

The District Judge made this finding in relation to the Heitzmann patent:

> "The only reference that disclosed a gauge which could be used in connection with a master fixture is Heitzmann, and Heitzmann contains all of the elements and the respective teachings of the other cited patents with respect to gauges for use in connection with a master fixture.

> "The Heitzmann reference was the subject of considerable attention by the plaintiff at trial. It was the only prior art reference of which the plaintiff introduced a model and, further, consistently at trial, the plaintiff maintained that Heitzmann, which was designed as out-of-roundness gauge for determining the wear on aircraft cylinders, could be used as a hole location and concentricity gauge since it was designed to reference solely with

respect to a bore. However, it was clearly brought out on cross-examination that Heitzmann would not, if used with a master fixture, pilot off a bore in the master fixture but, in contrast, the gauge of Heitzmann would reference off of the top surface of the master fixture. This difference in structure and function is of considerable importance since inaccurate results would be obtained if the top surface was out of square with the bore. Thus, Heitzmann is neither structurally or functionally a hole location and concentricity gauge."

This finding might be read as holding that the Heitzmann patent did not disclose a concentricity gauge. It clearly did do so, however, and if an interpretation to the contrary were warranted, the finding in this regard would be clearly erroneous. Fed.R.Civ.P. 52(a).

While the Heitzmann concentricity gauge was used for checking the bore of airplane and automobile cylinders and was not employed (as are the gauges with which we are here concerned) in conjunction with a master gauge for hole location, it did combine a rotatable probe with a stationary gauge. We do not agree with the District Court that the fact that the St. Amour gauge measures hole location while the Heitzmann gauge does not is of primary significance. In fact, according to the testimony of Eisele's expert witness, the adaptation of the latter to a hole location and concentricity gauge would be a mechanical step of the simplest nature.

Nor do we think that the fact that St. Amour had not previously held concentricity gauge patents or worked directly upon such devices of and by itself serves to demonstrate nonobviousness of the improvement upon which he was granted a patent. Indeed, it might be argued that the fact that St. Amour was an "outsider" if relevant at all, tends to cut the other way on the issue of obviousness.

■ Since the Heitzmann gauge was not before the Patent Office when the St.

Amour patent was considered, there is clearly no presumption of validity of this patent applicable to this undisclosed portion of the prior art. Everest & Jennings, Inc. v. Colson Corp., 371 F.2d 240, 242 (7th Cir.), cert. denied, 387 U.S. 918, 87 S.Ct. 2032, 18 L.Ed.2d 971 (1967); Felburn v. New York Central R. R., 350 F.2d 416, 421 (6th Cir. 1965), cert. denied, 383 U.S. 935, 86 S.Ct. 1063, 15 L.Ed. 2d 852 (1966); O'Leary v. Liggett Drug Co., 150 F.2d 656, 664 (6th Cir.), cert. denied, 326 U.S. 773, 66 S.Ct. 232, 90 L. Ed. 467 (1945).

Whether or not the "basic factual inquiries," which are required by Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), prior to determining nonobviousness, are accurate must be judged under the clearly erroneous standard. Fed.R.Civ.P. 52(a). But the ultimate test of patent validity under section 103 is a question of law. Graham v. John Deere Co., *supra* at 17, 86 S.Ct. 684; Monroe Auto Equipment Co. v. Heckethorn Mfg. & Supply Co., 332 F.2d 406 (6th Cir.), cert. denied, 379 U.S. 888, 85 S.Ct. 160, 13 L.Ed.2d 93 (1964); Bergman v. Aluminum Lock Shingle Corp. of America, 251 F.2d 801 (9th Cir. 1957); Swofford v. B. & W., Inc., 395 F.2d 362 (5th Cir.), cert. denied, 393 U.S. 935, 89 S.Ct. 296, 21 L.Ed. 2d 272 (1968); Kiva Corporation v. Baker Oil Tools, Inc., 412 F.2d 546 (5th Cir. 1969). *See also* Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950); Mahn v. Harwood, 112 U.S. 354, 358, 6 S.Ct. 451, 28 L.Ed. 665 (1884). We believe the holding of the Supreme Court in the *Graham* case is equally applicable here:

"We conclude that the claims in issue in the Scoggin patent must fall as not meeting the test of § 103, since the differences between them and the pertinent prior art would have been obvious to a person reasonably skilled in that art." Graham v. John Deere Co., 383 U.S. 1, 37, 86 S.Ct. 703 (1966).

*See also* Anderson's-Black Rock, Inc. v. Pavement Salvage Co., 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969).

Reversed and remanded for entry of a judgment holding patent No. 2,998,656 to be invalid under Section 103.